**CREDIT COMMERCIAL DE FRANCE, S.A., Finely, S.A., and HSBC Private Banking, Ltd., f/k/a Handelsfinanz– CCF Bank International Ltd., Appellants,**

v.

**R. MORALES, H.R. Baxter, and V.B. Elizalde, individually and on behalf of a class of all others similarly situated, Appellees.**

No. 04–04–00813–CV.

Court of Appeals of Texas, San Antonio.

Feb. 15, 2006.

Rehearing Overruled March 24 and May 3, 2006.

Luther H. Soules III, Robinson C. Ramsey, Sara Murray, Langley & Banack, Inc., San Antonio, Steven A. Fleckman Zachariah Wolfe, Fleckman & McGlynn, P.L.L.C., Austin, for appellants.

Gerald T. Drought, Martin, Drought 7 Torres, Inc., San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

This is an accelerated, interlocutory appeal of the trial court's order overruling the special appearances of Credit Commercial de France, S.A., Finely, S.A., and HSBC Private Banking, Ltd. f/k/a Handelsfinanz–CCF Bank International, Ltd. Because we conclude that a Texas court cannot assert personal jurisdiction over any of these entities, we reverse the trial court's order and render judgment dismissing the claims against them for want of jurisdiction.

### PROCEDURAL BACKGROUND

Appellees Rosana Morales and Hugo Baxter ("Sharp investors"), Mexican nationals from Monterrey, Mexico, represent a class of investors from Mexico who invested money through Sharp Capital, Inc. ("Sharp") and subsequently lost $50 million upon Sharp's financial collapse. The Sharp investors allege that Appellants Credit Commercial de France, S.A. ("CCF"), Finely, S.A. ("Finely"), and HSBC Private Banking, Ltd. f/k/a Handelsfinanz–CCF Bank International, Ltd. ("HF–CCFI") assisted Sharp in its scheme to disguise Sharp's true financial situation and the type of investments it was acquiring. The Sharp investors sued appellants for violations of the Texas Securities Act, aiding and abetting Sharp to commit violations of the Texas Securities Act, conspiracy to violate the Texas Securities Act, participation in breach of fiduciary duty, aiding and abetting Sharp to commit fraud, conspiracy to commit fraud, aiding and abetting Sharp to commit conversion, conspiracy to commit conversion, fraudulent conveyance, fraud in stock transactions, negligence, gross negligence, and civil RICO.

In response, CCF, Finely, and HF–CCFI all filed special appearances, arguing that they are not subject to personal jurisdiction in Texas. After a three-day

hearing, the trial court overruled their special appearances, determining that they are subject to personal jurisdiction in Texas. CCF, Finely, and HF–CCFI appeal the trial court's order.

### FACTUAL BACKGROUND

Sharp, a Texas Corporation, was formed in 1986 by Mauricio Gutierrez and executives of Casa de Bolsa Arka ("Arka"), a Mexican investment brokerage owned and controlled by Humberto Lobo and his family, who also owned the Mexican industrial conglomerate Grupo Protexa ("Protexa"). The executives of Arka established Sharp in San Antonio, Texas as the American finance branch for Arka. Sharp was charged with administering Arka's clients', Lobo's, and Protexa's non-Mexican investments. Sharp was registered with the Securities and Exchange Commission ("SEC") as an investment advisor under the Investment Advisor's Act, and Gutierrez served as President and Managing Director of Sharp. Although founded in San Antonio, Sharp's administrative office later moved to Irving, Texas, where Gutierrez resided. Although the Lobo family helped found Sharp, in 1994, the Lobo family transferred its interest in Sharp to Gutierrez.

Sharp provided investment advice to Mexican national investors. The investors would establish account agreements with Sharp and would send money to Sharp for investment purposes. At first, NationsBank acted as the custodian for the investors' funds and assets, while Sharp possessed a power of attorney from each investor, allowing it to engage in securities transactions on their behalf. Later, Sharp itself became the custodian of the investors' funds and investment assets.

Here, Rosana Morales and Hugo Baxter represent a class of Sharp investors. Both are Mexican citizens who reside in Monterrey, Mexico, and both invested money in Sharp and signed custodial agreements with Sharp. According to the Sharp investors, as Mexican nationals, investing through Texas-based Sharp was attractive because it allowed them to invest in dollar-denominated instruments, thereby avoiding the insecurity associated with Mexico's frequent currency devaluations. And, according to the Sharp investors, they believed that Sharp was investing their money in low-risk investments. In fact, however, Sharp was investing their money in high-risk investments without their knowledge.

Although Sharp did not have a license in the United States to operate a mutual fund, it operated like one, pooling the investors' funds. In 1993, Sharp was the subject of a surprise SEC regulatory audit. As a result of its review, on October 5, 1993, the SEC sent Gutierrez a letter informing him that Sharp's practices were in violation of U.S. securities law. In particular, the SEC found that "Sharp's pooling of client funds for the purchase of Eurobonds and the making of loans" met the definition of a "mutual fund" under the Investment Company Act. The SEC also criticized Sharp for engaging in leveraged transactions using its clients' funds, noting that neither the leveraged transactions nor the risk associated with them had been disclosed to or approved by Sharp's clients. The SEC warned Gutierrez that continuing these types of activities could violate the anti-fraud section of the Advisor's Act.

In response to the SEC's investigation and warnings, Gutierrez began looking for a way to evade SEC regulation and U.S. securities laws. Gutierrez's plan was to create an offshore company that he could control from Texas but would be located outside of the SEC's jurisdiction. He

would transfer all of Sharp's assets to the new offshore entity, which in turn, would become a "service provider," sending Sharp investment confirmations. Sharp would serve as the investment advisor to the offshore company. When Nations-Bank refused to continue serving as the lender of record, Sharp began looking for another lender registered with the Mexican Treasury Department, *Hacienda*,[1] to act as the lender of record on the "participated loans transactions" in order to roll over the existing NationsBank loans to the new lender. CCF, a bank registered with *Hacienda*, and its subsidiary, Finely, suited Sharp's needs. According to Gutierrez, CCF and its subsidiary, Finely, were attractive partners because of their presence and experience in the international markets, especially in emerging markets.

CCF is a French commercial bank headquartered in Paris, France. Finely, is a subsidiary of CCF and has its only office in Paris. During the 1990s, Finely arranged financing in the emerging markets, including loans with CCF and other banks. Neither CCF nor Finely has ever maintained assets, a bank account, a tax domicile, representatives or a registered agent in Texas.

Roman Kamir, the Director of Finely, first met Gutierrez in Mexico in 1995 while there on business. Gutierrez contacted Kamir and Christian Deseglise, Kamir's subordinate, inquiring whether CCF could be willing to act as the lender of record. According to Gutierrez, Kamir and Deseglise informed him that CCF was registered with *Hacienda* and would be willing to act as the lender. Thus, in November 1995, Gutierrez traveled to Paris, France to meet with Kamir and Deseglise. At that meeting, Gutierrez informed Kamir and Deseglise that he was looking for an offshore service provider that would hold Sharp's assets and would send account statements to Sharp. According to Gutierrez, Kamir recommended creating a new entity in the Bahamas because CCF already had its subsidiary, HF–CCFI, in the Bahamas.

HF–CCFI is a Bahamian banking corporation whose headquarters and principal place of business, personnel, facilities, and assets are located in Nassau, the Bahamas. In March 1996, Kamir and Gutierrez traveled together to visit HF–CCFI in the Bahamas, where Kamir introduced Gutierrez to Ferdinand Menconi, general manager of HF–CCFI, and Ivano Alliata, executive vice president of HF–CCFI. Gutierrez explained to Menconi and Alliata that Sharp wanted to create an offshore entity that would hold assets for the benefit of Sharp, would buy and sell securities on Sharp's behalf, and would send Sharp confirmations of assets. At the meeting, Gutierrez decided to engage HF–CCFI's affiliate, HF Consulting, to form EMCA. Menconi then sent Gutierrez correspondence dated June 11, 1996, explaining HF–CCFI's Bahamian banking services and the Bahamian services of HF Consulting for setting up offshore companies. Gutierrez appointed a friend from San Antonio, Luis Montes de Oca, as the person to handle the establishment of EMCA for Sharp.

In June 1996, Deseglise and another Finely employee, Carole Bortoli, traveled to Texas to visit InverWorld, CCF's client, in San Antonio, Texas. In traveling from Paris to San Antonio, the only flight Deseglise could book stopped in Dallas, Texas. So, although he had not planned to meet with Gutierrez during his short stop in Dallas, he decided to call Gutierrez and

---

**1.** The bank of record had to be registered with *Hacienda* so that borrowers could receive favorable withholding tax treatment in Mexico.

inform him that he would be in Dallas. Deseglise testified that there was no business objective in meeting with Gutierrez; it was a "courtesy visit." According to Deseglise, although he and Gutierrez discussed the state of their business relationship, the visit was "more of a social visit than something which had to do with specific transactions." According to Montes de Oca, who was also present at this meeting, Deseglise and Gutierrez discussed the new offshore company that was to be created.

After the meeting, on June 17, 1996, Deseglise faxed a letter to Gutierrez outlining various financial services, including custody and clearing services, that CCF and Finely could provide to the new offshore company that Gutierrez was going to form in the Bahamas with HF–CCFI. Also following that meeting, Gutierrez, Montes de Oca, and HF–CCFI's Alliata formed EMCA. Once EMCA was established, Gutierrez transferred all of Sharp's clients' investment assets to EMCA.

Through EMCA, Gutierrez invested in emerging-market bonds at high margins. In order to engage in this leveraged bond trading with CCF, on July 29, 1996, Sharp executed a Global Repurchase Agreement with CCF. Deseglise signed this agreement as "attorney-in-fact" for CCF. Gutierrez also had Alliata direct his employees to sign another Global Repurchase Agreement with CCF so that Gutierrez could have EMCA incur leverage to purchase emerging market bonds from CCF.

Through the Repurchase Agreements with CCF, Sharp and EMCA were able to purchase emerging bond markets from CCF on margin, with margin loan ratios of up to ninety percent. Through these Repurchase Agreements, CCF, with the assistance of its subsidiary Finely acting as the "arranger," provided about $50 million in margin financing to Sharp or EMCA for the purchase of emerging market bonds between 1996 and 1998.

In 1997, Gutierrez and Martinez traveled to Paris to meet with Kamir and Deseglise. At that meeting, Kamir discussed the profitability of certain securities issued by the Venezuelan government called "front loaded interest reduction bonds," or "FLIRBs." Gutierrez decided to invest in FLIRBs, and CCF provided margin financing up to 90% to EMCA so that Gutierrez could purchase $27 million worth of FLIRBs.

In the summer of 1998, with the collapse of the Russian ruble, the emerging bond market crashed. CCF and other lending institutions began making margin calls on EMCA. To satisfy the margin calls, in August 1998, CCF began selling the FLIRBs at record lows. However, the FLIRB's price had dropped to such a low level that CCF informed Gutierrez that the FLIRBs were not sufficient to satisfy the margin calls. As such, CCF began foreclosing on other valuable assets that it held in custody for Sharp/EMCA.

CCF then demanded that Gutierrez assign to CCF all of the participated loans held by EMCA for the benefit of Sharp's clients, including the Protexa loans. Gutierrez entered into an assignment agreement with CCF, whereby EMCA transferred to CCF all of its title and interest in the eleven participated loans that EMCA held.

In the Fall of 1998, the SEC launched yet another investigation of Sharp and EMCA. It filed an enforcement action against Sharp and EMCA in federal district court. It then intervened into Sharp's management and froze Sharp's and EMCA's assets. A special master was appointed to liquidate the company. In March 2001, Gutierrez, Martinez, and other Sharp employees were indicted by a

federal grand jury for securities and wire fraud. In June 2001, Gutierrez entered into a plea agreement, whereby the Justice Department agreed not to prosecute him for any offense he committed in connection with his involvement with HF–CCFI.

The Sharp investors then sued CCF, Finely, and HF–CCFI for their involvement with Sharp's actions, and in response, appellants filed a special appearance, claiming that they were not subject to personal jurisdiction in Texas. The trial court denied their special appearance, which they now appeal.

## STANDARD OF REVIEW

In a special appearance, the plaintiff bears the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the long-arm statute. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Id.*

Whether a court has personal jurisdiction over a defendant is a question of law. *Id.* at 794. However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *Id.* If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *Id.*

A trial court's conclusions of law are reviewed as a legal question. *Id.* The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judg-ment, the erroneous conclusion of law does not require reversal. *Id.*

When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

## IN PERSONAM JURISDICTION

The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–.045 (Vernon 1997 & Supp.2005). The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas. *BMC Software*, 83 S.W.3d at 795. The supreme court has held that the long-arm statute's broad language extends as far as the federal constitutional requirements of due process permit. *Id.* Thus, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions. *Id.*

Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *BMC Software*, 83 S.W.3d at 795. A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of con-

ducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *BMC Software*, 83 S.W.3d at 795. Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state. *BMC Software*, 83 S.W.3d at 795. However, a defendant should not be subject to a foreign court's jurisdiction based upon "random," "fortuitous," or "attenuated" contacts. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *BMC Software*, 83 S.W.3d at 795. And, because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country. *BMC Software*, 83 S.W.3d at 795.

▮▮▮▮ Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific or general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *BMC Software*, 83 S.W.3d at 795–96. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *BMC Software*, 83 S.W.3d at 796. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Id.* Here, the trial court determined that the

appellants were subject to specific jurisdiction, and neither party argues that general jurisdiction would apply.

## CREDIT COMMERCIAL DE FRANCE, S.A. AND FINELY, S.A.

### A. Specific Personal Jurisdiction

#### 1. Directed–a–Tort Jurisdiction

We must first determine whether CCF and Finely ("the CCF Defendants") are subject to specific jurisdiction. In their brief, the Sharp investors urge us to follow *Nocando Mem Holdings, Ltd. v. Credit Commercial de France, S.A.*, in which a federal district court found the CCF Defendants[2] to be subject to personal jurisdiction in Texas. *See Nocando Mem Holdings, Ltd. v. Credit Commercial de France, S.A.*, No. SA–01–1194–XR, 2004 WL 2603739 (W.D.Tex. Oct. 6, 2004). In doing so, the federal court noted that the case was unusual because the InverWorld investors "are asserting *tort* claims against the CCF Defendants while relying chiefly on the CCF Defendants' *contractual* dealings with Sharp and EMCA in their attempt to establish specific jurisdiction." *Id.* at *18. That is, "[r]ather than complaining about the breach of a contract between the plaintiff and defendant, plaintiffs are non-parties to the contract who claim they were harmed by Defendants' intentional tortious activity, part of which was carried out through the performance of contracts." *Id.* As here, the plaintiffs in *Nocando* were not parties to any contract with CCF, and their claims did not arise out of a breach of any contract. *Id.* at *19. The federal court concluded that "the minimum contacts standard applied to intentional tort cases is the governing standard, and not the contracts minimum

---

**2.** *Nocando* dealt with the collapse of Inver-World and the CCF Defendants' alleged in-

volvement in that collapse.

contacts standard applied in breach of contract cases." *Id.* The federal court reasoned that the intentional torts standard must apply "because a defendant must reasonably anticipate that he could be haled into a Texas court because of his alleged conduct, and the mere performance of a contract, without more, would not ordinarily cause a defendant to reasonably anticipate being haled into court to answer for an alleged intentional tort against a third party." *Id.* As such, the federal court held the following:

> [I]n an intentional tort case arising from contractual or business relationships, it should not be enough to demonstrate only that a defendant could foresee *some* consequences or effects in Texas. Instead, the defendant must intend or reasonably foresee the harmful consequences that give rise to the plaintiff's claims. Thus, in this case, Plaintiffs must establish a prima facie case that Defendants engaged in conduct directed at Texas with knowledge that the intended goal was to falsify the books of InverWorld, thereby causing harmful consequences in Texas. It would not be fair and reasonable to hale Defendants into court in Texas for the alleged fraud on InverWorld investors based solely on Defendants' innocent business dealings with Sharp and EMCA, even if those business dealings were sufficient to subject Defendants to specific personal jurisdiction for claims arising between the parties to the business deals. However, it would be fair and reasonable, and thus consistent with due process, to hale them into court in Texas if they knowingly engaged in their business deals with these Texas entities by "cleaning" the books of a Texas-based company. Because personal jurisdiction cannot be exercised over CCF based on the acts of the other alleged co-conspirators, there must be some act by CCF directed at

> Texas in furtherance of the scheme, coupled with its knowledge that the action or its consequences would result in the "cleaning" of InverWorld's books.

*Nocando,* 2004 WL 2603739, at *20. Applying *Nocando's* reasoning, the Sharp investors in their brief focused on whether the record reflected that the CCF Defendants intended or reasonably could have foreseen the harmful consequences that occurred in Texas. In other words, did the CCF Defendants "direct a tort" toward Texas?

However, since that time, the Texas Supreme Court issued its opinion in *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777 (Tex.2005). In *Michiana,* the supreme court criticized the type of directed-a-tort jurisdiction applied in *Nocando:*

> Several problems arise if jurisdiction turns not on a defendant's contacts, but on where it "directed a tort." First, it shifts a court's focus from the relationship among the *defendant,* the forum, and the litigation to the relationship among the *plaintiff,* the forum, and the litigation. The place where a plaintiff relies on fraud may determine the choice of law, but choice-of-law analysis considers all parties, local courts, legal policies, interested states, and the interstate and international systems. By contrast, minimum-contacts analysis focuses solely on the actions and reasonable expectations of the defendant.
>
> Second, directed-a-tort jurisdiction confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits. If purposeful availment depends on whether a tort was directed toward Texas, then a nonresident may defeat jurisdiction by proving there was no tort. Personal jurisdiction is a question of law for the court, even if it requires resolving questions of

fact. But what if a judge and jury could disagree? May a trial judge effectively grant summary judgment in a local jurisdiction by deciding contested liability facts in favor of the defendant? And if a jury absolves a defendant of tort liability, is the judgment void because the court never had jurisdiction of the defendant in the first place?

Business contacts are generally a matter of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.

Third, in cases dealing with commerce, a plaintiff often has the option to sue in either contract or tort. Here, for example, Holten alleged tort, contract, and statutory claims, as Texas law often allows a plaintiff to do. If directing a tort at Texas is enough, then personal jurisdiction arises when plaintiffs allege a tort, but not when they allege breach of contract. Thus, the *defendant's* purposeful availment depends on the form of claim selected by the *plaintiff.*

Fourth, changes in technology have made reliance on phone calls obsolete as proof of purposeful availment. While the ubiquity of "caller ID" may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location. If jurisdiction can be based on phone conversations "directed at" a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone? ...

For the reasons stated above, we disapprove of those opinions holding that (1) specific jurisdiction is necessarily estab-

lished by allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number, or that (2) *specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves.*

*Id.* at 790–92 (emphasis added) (quotations omitted) (citations omitted).

Thus, the supreme court in *Michiana* expressly disapproved of finding jurisdiction based on a tort being directed at Texas. This type of "directed-a-tort jurisdiction" is exactly the type of jurisdiction on which the court in *Nocando* based its decision. We, therefore, are precluded from following *Nocando* and instead, as directed by *Michiana,* in determining whether the CCF Defendants are subject to personal jurisdiction in Texas, will consider the CCF Defendants' contacts with Texas.

### 2. The CCF Defendants' Contacts with Texas

 As noted previously, the minimum-contacts analysis requires that a defendant "purposefully avail" itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of our laws. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002), *cert. denied,* 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In considering a defendant's contacts with Texas, it is the quality and nature of the contacts, rather

than their number, that is important to the minimum-contacts analysis. *Id.*

■ Here, CCF is a French commercial bank headquartered in Paris, France. Finely, a subsidiary of CCF, has its only office in Paris, France.[3] Neither has maintained a tax domicile, a registered agent, or representatives in Texas. Nor do they have any bank accounts or assets in Texas. With regard to CCF's contractual relationship with Sharp, not one agreement between CCF and Sharp was executed by CCF in Texas. The situs of the performance for each agreement was in France, where the loans were made. All loan documentation was prepared in New York City by CCF's counsel and reviewed for compliance with Mexican law by counsel in Monterrey. Additionally, the participated loans specified that the law and jurisdiction of New York would apply. *See Michiana,* 168 S.W.3d at 792–93 (noting that insertion of a clause designating a foreign forum suggests that no local availment was intended); *see also Burger King,* 471 U.S. at 482, 105 S.Ct. 2174 (holding that choice-of-law provisions should not be ignored in considering whether a defendant has "purposefully invoked the benefits and protections of a State's laws"). Likewise, the "repurchase agreements" were entered into in France by CCF and were all entered into at the request of Gutierrez. Further, the agreements adopted the application of English law and jurisdiction. The CCF Defendants argue, and we agree, that these transactions were clearly structured to avoid Texas jurisdiction, not to gain the benefits and protections of Texas law. Indeed, instead of

being structured for the CCF Defendants to gain the benefits and protections of Texas law, they were structured for *Sharp* to gain the benefits (in particular, tax benefits) of foreign jurisdictions like Mexico and the Bahamas. Additionally, the CCF Defendants emphasize that each transaction was initiated by Gutierrez, who reached out to the CCF Defendants in France for financial services there.

■ In response, the Sharp investors argue that the CCF Defendants had a four-year ongoing business relationship with Texas-based Sharp and that the CCF Defendants sold millions of dollars of financial instruments to Sharp and/or EMCA between 1995 and 1998. The Sharp investors point to the numerous phone calls and faxes between CCF and Sharp and bank statements that CCF sent to Sharp in Texas. However, once again, it is not the number of contacts, but the quality, that are important in a minimum-contacts analysis. First, merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction. *Freudensprung v. Offshore Tech. Serv., Inc.,* 379 F.3d 327, 344 (5th Cir.2004); *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir. 1986); *TeleVentures, Inc. v. Int'l Game Tech.,* 12 S.W.3d 900, 910 (Tex.App.-Austin 2000, pet. denied). Thus, the CCF Defendants did not subject themselves to Texas jurisdiction merely by having a four-year business relationship with Sharp. Second, minimum contacts may not be satisfied by merely engaging in communications with a Texas corporation during performance of a

---

**3.** We note that CCF argues that it is a distinct and separate company from Finely and that any contacts Finely's employees had with Texas cannot support us finding that Texas had personal jurisdiction over CCF. The Sharp investors, on the other hand, argue that any contacts Finely's employees had with Texas are imputed to CCF because Finely had CCF's power of attorney. We need not determine, however, whether Finely's employees' contacts with Texas can be imputed to CCF, because the contacts Finely's employees had with Texas are not sufficient minimum contacts to confer specific jurisdiction.

contract. *TeleVentures,* 12 S.W.3d at 910; *see Freudensprung,* 379 F.3d at 344 ("[T]his court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the exercise of specific personal jurisdiction over the nonresident defendant."); *Holt,* 801 F.2d at 778 (holding that defendant was not subject to specific jurisdiction where nonresident defendant entered into a contract with a Texas resident, sent an agreement and checks to Texas, and engaged in extensive telephonic and written communications with the plaintiff in Texas); *Stuart v. Spademan,* 772 F.2d 1185, 1192–94 (5th Cir.1985) (finding no specific jurisdiction where nonresident defendant contracted with Texas residents, directed letters and phone calls to Texas, shipped prototypes and products to Texas, negotiated a contract with plaintiffs that was to be governed by Texas law, and marketed his product in Texas). Here, the exchange of communications between CCF and Sharp in the course of developing and carrying out the contractual obligations are, in themselves, insufficient to constitute purposeful availment of the benefits and protections of Texas law. *TeleVentures,* 12 S.W.3d at 910.

The Sharp investors also argue that in furtherance of their relationship with Sharp, the CCF Defendants' officers and employees traveled to Texas on at least four occasions. Roman Kamir and Christian Deseglise, both Finely employees during the time in question, visited Texas. According to Kamir's deposition, during the time he worked for Finely, he traveled to Texas about three times: once to visit Sharp's offices and the other times in transit to Mexico. According to Kamir, in Monterrey, Mexico, Finely was "setting up

a credit operation for a Mexican company." He was in Monterrey with other bankers, and "the Sharp representatives were involved in the operation." In his affidavit, Gutierrez affirms that the business meetings occurred in Monterrey, Mexico:

> Roman Kamir traveled to Dallas, Texas to meet with me on two occasions, and on each occasion we traveled together to Monterrey to meet with representatives from Pulsar. I do not remember the exact dates of those trips, including whether they occurred before or after my trip to Paris in November, 1995. But either on the way to or back from Monterrey on at least one of the two trips, Kamir stayed in Dallas, Texas for a couple of days, and we met at Sharp's Irving offices to discuss continuing business between Sharp, and CCF and Finely.

Looking at the testimony of both Kamir and Gutierrez, it is clear that Kamir's contact with Texas was incidental. Indeed, both agree Kamir's visit to Texas was a "stop-over" and that Monterrey, Mexico was where they traveled for the meeting with the bankers and the Mexican company.

With respect to Deseglise traveling to Texas, he testified in his deposition that he visited Texas in June of 1996. The purpose of the trip was to meet with another company, InverWorld, in San Antonio, Texas. On his way to San Antonio, Deseglise had a lay-over in Dallas, Texas. Because he would be in Dallas (if only for a short time), Deseglise called Gutierrez, told him that he would be in Dallas, and asked if Gutierrez wanted to meet. According to Deseglise, the request for a meeting "was more like a courtesy visit. There was no business object and I was not planning, if the plane had gone directly to San Antonio, I would not have stayed in Dallas and I would not have gone to Dal-

las. The reason was to see InverWorld." Deseglise testified that he met with Gutierrez, and they went to dinner. They did discuss the state of their business relationship, but that the dinner was more of a social visit than a business meeting:

> Actually when I came back from San Antonio, we had another meeting with Mauricio Gutierrez, and I said—I remember joking about that on the way to San Antonio—I said, "I am going to see one of your competitors," because I thought that they were competing for the same business, which was managing money for Mexican clients. And I said, "We are thinking about doing clearing services, providing clearing services for InverWorld." And [Gutierrez] said that maybe [those services] could be of interest to me too. I think that at that time, he was doing [those services] with Swiss Bank, I think, I don't remember with what company. So I said, well, when I get back to Paris, I will send you a proposal for how we could be acting as a clearing service agent.

After Deseglise returned to Paris, CCF sent a proposal to Sharp about clearing services. Thus, only after Gutierrez expressed interest in CCF's services did Deseglise send a proposal to Sharp in Texas. Moreover, as shown through Deseglise and Gutierrez's depositions, the proposal was never accepted.

The Sharp investors also point to a letter sent to Sharp by CCF–Finely in 1998 about Brazilian bonds and another one about a "defeasance" financial structure. However, again, neither one of these proposals was accepted by Sharp.

Looking at the quality of CCF and Finely's contacts with Texas, it is clear that CCF and Finely did not purposefully avail themselves of the privilege of conducting activities in Texas. Nor did they invoke the benefits and protections of Texas laws.

We, therefore, hold that CCF and Finely are not subject to personal jurisdiction in Texas.

### HF–CCFI

■ HF–CCFI is a Bahamian banking corporation whose headquarters and principal place of business are in Nassau, the Bahamas. It is an indirectly owned and operated subsidiary of CCF. Its personnel, facilities, and assets are all located in the Bahamas. It has never had a mailing address, post office box, or telephone number in Texas. It has never owned, leased, or controlled real property in Texas. It has never paid, nor been obligated to pay taxes in Texas. It has never advertised nor been a party plaintiff to any Texas legal proceeding. Further, no HF–CCFI employee or representative has ever resided in, or traveled to, Texas for the purpose of doing business on behalf of HF–CCFI. No HF–CCFI employee or representative has ever met in Texas with any employee or representative of Sharp. Nor has any HF–CCFI employee or representative ever met in Texas with any employee or representative of EMCA, the Bahamian company owned and controlled by Gutierrez.

HF–CCFI recognizes that in 1996, in the Bahamas, Finely introduced Gutierrez to HF–CCFI, an indirect affiliate of Finely. On March 20, 1996, Gutierrez and Roman Kamir met in the Bahamas with HF–CCFI's president, F.M. Menconi, and its vice-president, Ivano Alliata. At that meeting in the Bahamas, Gutierrez decided to hire HF–CCFI's affiliate, HF Consulting, to form EMCA as a Bahamian IBC. On June 11, 1996, Menconi sent Gutierrez correspondence, explaining HF–CCFI's Bahamian banking services and HF Consulting's services for setting up offshore companies. At Gutierrez's request, in July 1996, Alliata mailed to Luis

Montes de Oca, Gutierrez's intermediary in San Antonio, copies of corporate documents regarding the formation of EMCA in the Bahamas, as well as correspondence relating to opening a Bahamian bank account for EMCA with HF–CCFI. Thus, HF–CCFI sent this correspondence to Texas only upon Gutierrez's request.

Gutierrez and Martinez of Sharp owned and controlled EMCA. According to HF–CCFI, consistent with Bahamian customary practice, EMCA had nominal directors in the Bahamas, who acted only on instructions from EMCA's owners. The initial nominal EMCA directors were employees of HF Consulting, not HF–CCFI. HF–CCFI did provide banking services for EMCA at its Nassau headquarters. From 1996 to 1998, HF–CCFI sent quarterly EMCA account statements from the Bahamas to Gutierrez in Texas and communicated with Sharp regularly by telephone and fax regarding EMCA's banking activities in the Bahamas. At Gutierrez's request, Alliata faxed transaction reports from the Bahamas to Sharp, showing the activity that had transpired in EMCA's account each day.

As such, HF–CCFI's contacts with Texas consisted of remote communications, such as telephone calls, faxes, bank statements, and other correspondence, originating in the Bahamas and relating to the receipt in the Bahamas of funds sent from Texas and to the dispatch of funds from the Bahamas to Texas from a bank account maintained in the Bahamas by

EMCA, a Bahamian entity. These contacts merely show that it was doing business in the Bahamas and was apprising Sharp of those Bahamian business activities. Looking at the quality of these contacts with Texas, we hold that HF–CCFI did not purposefully avail itself of the privilege of conducting activities in Texas; nor did it invoke the benefits and protections of Texas laws. Instead, by conducting business with HF–CCFI in the Bahamas, Sharp was invoking the benefits and protections of Bahamian law.[4] Therefore, HF–CCFI is not subject to personal jurisdiction in Texas.

### CONCLUSION

Having determined that CCF, Finely, and HF–CCFI are not subject to personal jurisdiction in Texas, we reverse the order of the trial court and render judgment dismissing the claims against CCF, Finely, and HF–CCFI for want of jurisdiction.

---

4. In their brief, the Sharp investors argue that from 1996 to 1998, HF–CCFI purposefully directed activities at Texas by engaging in an ongoing business relationship with Sharp. According to the Sharp investors, "pursuant to that ongoing business relationship, HF–CCFI purposefully directed activities toward Sharp in Texas related to the establishment and operation of the EMCA scheme that was used to defraud the Sharp investors, including

contacts with Texas related to the formation of EMCA, the transfer of Sharp's clients' assets to EMCA, the management of EMCA, the trading of securities through EMCA, and the transmittal of fraudulent asset confirmation statements to Texas from EMCA." The Sharp investors' argument, however, is exactly the type of direct-a-tort analysis that the supreme court precluded in *Michiana.*