*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★                                        ★ ★ ★



# OPINION

Nos. 04-09-00285-CV & 04-09-00286-CV

**INNOVATIVE THERAPIES, INC**.,
Appellant

v.

**KINETIC CONCEPTS, INC.**, KCI Licensing, Inc., and KCI USA, Inc.,
Appellees

From the 408th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2008-CI-00026 & 2008-CI-08912
Honorable Larry Noll, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:     Catherine Stone, Chief Justice
             Phylis J. Speedlin, Justice
             Marialyn Barnard, Justice

Delivered and Filed:   April 14, 2010

AFFIRMED

In this consolidated interlocutory appeal, Innovative Therapies, Inc. appeals the trial court's orders denying its special appearances. Because the record demonstrates that Innovative Therapies has jurisdictionally-meaningful contacts with Texas and because the exercise of personal jurisdiction over it in the underlying suits would not violate constitutional guarantees of substantive due process, we affirm the trial court's orders.

## BACKGROUND

In January 2008, Kinetic Concepts, Inc., KCI Licensing, Inc., and KCI USA, Inc. (collectively "KCI") sued Innovative Therapies and three of its officers, David Tumey, Richard Vogel, and Mark Meents, alleging that Innovative Therapies illegally used knowledge of KCI's trade secrets to create a "knock-off" product to compete with one of KCI's signature medical devices, the Vacuum-Assisted-Closure System ("V.A.C.").[1] Allegations against Innovative Therapies included claims of misappropriation and theft of trade secrets, conversion, and tortious interference with KCI's contracts with its clients and employees. Several months later, in June 2008, after some discovery, KCI filed a second suit alleging the same causes of action against Innovative Therapies and adding a new defendant, Dr. Tianning Xu, who was a principal engineer of the V.A.C. for six years while employed at KCI and who subsequently assisted in developing Innovative Therapies's competing product.

Innovative Therapies filed a special appearance in each of KCI's two suits, while all of the individual defendants entered general appearances. After lengthy jurisdictional-related discovery and a hearing, the trial court denied Innovative Therapies's special appearances in both cases. This consolidated interlocutory appeal followed. In three issues, Innovative Therapies argues the trial court erred in concluding that it is subject to personal jurisdiction in Texas, and asserts it is entitled to dismissal of both suits.

## APPLICABLE LAW

Personal jurisdiction is a question of law. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). When the facts underlying the jurisdictional issue are undisputed,

---

[1] The V.A.C. was developed to treat difficult wounds through negative pressure wound therapy.

we review the trial court's determination *de novo*. *Id.* However, the trial court must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

Texas courts may exercise in personam jurisdiction over a nonresident defendant as authorized under the Texas long-arm statute,[2] provided the exercise of such personal jurisdiction meets federal and state constitutional due process guarantees. *Republic Drilling*, 278 S.W.3d at 337; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). To meet constitutional due process guarantees, the court must find that (1) the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, and (2) the court's assertion of jurisdiction meets "traditional notions of fair play and substantial justice." *Republic Drilling*, 278 S.W.3d at 338.

A nonresident's contacts in the forum state can give rise to either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic. *Id.* at 796. Specific jurisdiction arises when: (1) the defendant purposefully avails itself of conducting activities in the forum state; and (2) the

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 2008) (providing that a nonresident "does business" in Texas if it (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas, (2) commits a tort in whole or in part in Texas, or (3) recruits Texas residents, directly or through an intermediary located in Texas, for employment inside or outside Texas).

cause of action arises from or is related to those contacts or activities. *Id.* at 795. Purposeful availment is the "touchstone of jurisdictional due process," being "some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). For the purpose of determining if a nonresident defendant purposefully availed itself of the privilege of conducting activities in Texas, (1) only the defendant's contacts with the forum are relevant, (2) the contacts must be purposeful rather than random, fortuitous, or attenuated, and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Republic Drilling*, 278 S.W.3d at 338-39; *Moki Mac*, 221 S.W.3d at 575 (recognizing there are three parts to a "purposeful availment" inquiry). A nonresident defendant cannot be subjected to the jurisdiction of a Texas court based on the unilateral acts of a third party. *Michiana*, 168 S.W.3d at 785. Similarly, if a nonresident defendant's contacts with Texas are merely random, fortuitous, or attenuated, it is not subject to Texas jurisdiction. *Id.* Rather, the minimum-contacts analysis focuses on the "quality and nature of the defendant's contacts, rather than their number." *Republic Drilling*, 278 S.W.3d at 339. The nonresident's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *BMC Software*, 83 S.W.3d at 795; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A nonresident defendant may structure its transactions so that it neither profits from nor avails itself of the benefits of the forum state's laws in order to purposefully avoid a particular forum. *Moki Mac*, 221 S.W.3d at 575.

### DISCUSSION

Innovative Therapies contends the trial court erred in denying its special appearances because it has no constitutionally-cognizable contacts with Texas to support either general or specific jurisdiction. Innovative Therapies stresses that it structured its transactions in a manner to purposefully avoid Texas, and that all of the contacts cited in the trial court are little more than allegations that Innovative Therapies directed a tort to Texas which is insufficient to support an exercise of jurisdiction under Texas Supreme Court precedent. KCI counters that Innovative Therapies's contacts in Texas give rise to both specific and general jurisdiction. We will begin our analysis by examining KCI's claim that Innovative Therapies's actions in contacting, recruiting, and employing Xu, a Texas resident, are sufficient, standing alone, to support the legal conclusion that Innovative Therapies is subject to specific jurisdiction in a Texas court.

### I. PROOF SUBMITTED IN SUPPORT OF SPECIFIC JURISDICTION

#### A. *Innovative Therapies, Inc.*

Innovative Therapies is a Delaware corporation founded by Richard Vogel and Dr. Paul Svedman, along with others, to research, develop, and produce therapies in the field of patient wound care. Its sole place of business is Gaithersburg, Maryland. It has neither employees nor property in Texas, and does not have a registered agent for service in Texas. Three of its founders and original officers, Vogel, Tumey, and Meents, had all previously been employed by KCI at its principal place of business in San Antonio, Texas. Vogel, the current Chief Executive Officer of Innovative Therapies, served as a Vice President and Executive Committee member of KCI; Tumey, the current Chief Technology Officer of Innovative Therapies, served as Director of KCI's Research and Development Department, during which time he managed the development of the V.A.C.; and

Meents, the Chief Operating Officer of Innovative Therapies, worked as Vice President of Sales Administration and New Technologies for KCI.

Relevant to this litigation, Innovative Therapies set out to develop a negative pressure wound therapy device based upon Dr. Paul Svedman's work in wound treatment. Dr. Svedman is a plastic and reconstructive surgeon, inventor, and professor of medicine. A third-party vendor hired by Innovative Therapies initially developed a prototype for the Svedman Wound Treatment System (the "Svedman device"). After Tumey joined the company in September 2006, he supervised efforts to improve the prototype. The Svedman device is an alternative to the V.A.C., a wound therapy device marketed and sold by KCI. Innovative Therapies has a stated corporate policy that forbids marketing or selling the Svedman device to users in Texas.

### B. Dr. Xu

Dr. Tianning Xu worked in the Research and Development Department at KCI from 1997 until January 2006, six years of that time as a principal engineer on the V.A.C. During his employment at KCI, Xu knew Vogel, Tumey, and Meents. In fact, Xu reported directly to Tumey while serving as principal engineer on the V.A.C. Xu left KCI in January 2006 and continued to live in San Antonio from January 2006 to May 2007, at which time he relocated to Atlanta, Georgia.

After he left KCI, Dr. Xu initially went to work for a KCI competitor, BlueSky Medical, located in San Antonio, from January 2006 until September 2006. Once he left KCI, Xu was subject to the terms of an on-going non-disclosure agreement with KCI that, among other things, prohibited Xu from sharing confidential information learned while employed by KCI.[3] An assignment clause

---

[3] Vogel, Tumey, and Meents had also signed nearly identical Confidentiality Agreements when hired by KCI.

provided that any invention developed by Xu during the three-year period after he left KCI was owned by KCI.

### C. Innovative Therapies and Dr. Xu

On September 3 or 4, 2006, Vogel, acting on behalf of Innovative Therapies, contacted Xu by telephone in San Antonio. At the time of the initial phone conversation, Vogel knew Dr. Xu's work as an engineer from their time together at KCI. He also knew Xu was currently employed by BlueSky but denied knowing he was located in San Antonio. During that first conversation, Vogel discussed wanting Xu to leave BlueSky and help develop the Svedman prototype for FDA approval. They also discussed the fact that working with Innovative Therapies might create a conflict of interest with BlueSky because both entities were working on negative pressure wound therapy devices. Xu mentioned to Vogel that he would have to resign from BlueSky in order to do work for Innovative Therapies. At the conclusion of the conversation, Xu agreed to go to Maryland to meet with Vogel and Tumey and to inspect the prototype. Vogel admitted in his deposition that he wanted to "pry [Xu] away from Blue Sky" in the fall of 2006.[4]

Soon after that initial phone contact, at Vogel's invitation, Xu traveled to Maryland and met with Vogel and others from Innovative Therapies. Xu spent two to three hours with Tumey discussing how they would work on improving the prototype together–what part Xu would do, and what part Tumey would do. According to his deposition, based on his discussions with Tumey, Xu understood that if he accepted the job, he would be working on the electronics components of the

---

[4] Vogel stated in his deposition, "My issues were apprising [Xu] of the venture and getting him to stop working for a competitor; in other words, Blue Sky." Vogel explained, "I just laid out certain–you know, the vision, what we would like to do, working together as a team. And he had other things that he was working on that he also wanted to pursue, and he thought this might be a good opportunity to do that . . . So it was a matter of talking, talking and more talking, and finally he decided Blue Sky was not where he wanted to be long-term."

device and Tumey would simultaneously be working on other parts of the device.[5] Innovative Therapies reimbursed Xu for all of his travel expenses from San Antonio to Maryland.

Shortly thereafter, on September 15, 2006, Xu resigned from his paid position with BlueSky and began to work for Innovative Therapies on its Svedman prototype.[6] For approximately seven months, from September 2006 to May 2007, Xu "did some work to redesign [the] prototype, existing prototype, [to] make it more in line with medical device guideline [sic] so that it [could] be approved by the FDA." At Innovative Therapies's request, Xu designed a printed circuit board prototype and wrote a software code for the prototype at his home in San Antonio. During this period, Vogel and Tumey had on-going discussions with Xu in Texas by telephone once or twice a week about their progress on the prototype modifications. Xu reported to Vogel and Tumey about the electronics work he was doing on the prototype. In addition, Vogel and Tumey corresponded with Xu about the device using emails. At Innovative Therapies's request and expense, Xu traveled to Maryland to meet with Tumey, Vogel, and Meents on five or six occasions. While in Texas, with Innovative Therapies's approval, Xu purchased component parts for the prototype and built a new prototype device at his home in San Antonio. Xu delivered the drawing of the printed circuit board by e-mail

---

[5] Xu's deposition contains the following exchange about Xu's meeting with Tumey during his initial visit to Maryland:

> Q: Tell me what you and Mr. Tumey discussed about the ITI device.
> A: We inspect – inspected the prototype.
> Q: And did you discuss what work you could do on the ITI device?
> A: We discussed what work we need to do.
> Q: And – and was there a discussion about what part of the work you would do and what part of the work Mr. Tumey would do?
> A: I believe so.

[6] On the same day Xu began working as a consultant on the Svedman device, he also started working for Vogel and Tumey on a new haptic device being developed by one of their other companies, Immersion Medical. Xu continued to work on Immersion Medical's device from September 2006 through May or June 2008. Xu was paid $20,000 in 2006, and $180,000 in 2007 by Immersion Medical.

to Tumey at Innovative Therapies in January or February 2007, and delivered the software code to Tumey by email in May or June 2007. Subsequently, Innovative Therapies incorporated Xu's improvements into the device, and received Food and Drug Administration approval to market the Svedman device.

Xu characterized his position as a "consultant" and testified that his work for Innovative Therapies amounted to only three to five percent of his total work time, and he received no monetary compensation from Innovative Therapies while he resided in Texas. In October 2007, however, after he relocated to Atlanta, Xu received shares of Innovative Therapies's stock as compensation for his work on the Svedman prototype. Innovative Therapies also reimbursed Xu for his travel expenses and his out-of-pocket expenses incurred for his work on the Svedman prototype while in Texas.

## II. APPLICATION OF LAW TO FACTS

### A. Texas Long-Arm Statute

Under the Texas long-arm statute, a nonresident "does business" in Texas when it recruits Texas residents, directly or through an intermediary located in Texas, for employment inside or outside Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(3) (Vernon 2008). As an initial matter, we note Innovative Therapies argues that Xu was not an employee of, and was not paid or compensated by, Innovative Therapies during the time that he was in Texas. Based on the record, however, we disagree. It is virtually undisputed that Vogel, on behalf of Innovative Therapies, actively recruited Xu to leave his well-paying job at BlueSky in order to work on the Svedman prototype. Thereafter, Innovative Therapies reimbursed Xu for all expenses and costs associated with both component parts and travel necessary to completing his work. Ultimately, Xu received 2% stock ownership in Innovative Therapies which he testified was in exchange for the work he had

done on the Svedman device. We conclude there is legally and factually sufficient evidence to support the trial court's implied finding that Innovative Therapies recruited Xu to work on the Svedman device and compensated him for that work. *See BMC Software*, 83 S.W.3d at 795 (when trial court does not issue findings of fact, all facts necessary to support the ruling and supported by the evidence are implied). Accordingly, under the Texas long-arm statute, Innovative Therapies's action of recruiting Xu to work on the Svedman prototype is defined as an act constituting doing business in this state. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(3); *see also Moreno v. Poverty Point Produce, Inc.*, 243 F.R.D. 265, 271 (S.D. Tex. 2007) (Texas has an interest in enforcing the provision of its long-arm statute that specifically subjects nonresidents who recruit Texas residents to personal jurisdiction in Texas); *Gonsalez Moreno v. Milk Train, Inc.*, 182 F. Supp. 2d 590, 594-95 (W.D. Tex. 2002) (jurisdiction proper where defendant, through intermediary, recruited Texas residents to work in New York and reimbursed their travel expenses). Of course, for jurisdictional purposes, the Texas long-arm statute reaches only as far as due process guarantees allow. Therefore, we next determine whether Innovative Therapies's contacts with Xu in Texas satisfy the purposeful availment requirement of the due process minimum contacts analysis. *Republic Drilling*, 278 S.W.3d at 337; *Moki Mac*, 221 S.W.3d at 574.

## B. Due Process Analysis

In conducting a due process analysis, the relevant inquiries are whether (1) the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, and (2) the court's assertion of jurisdiction meets "traditional notions of fair play and substantial justice." *Republic Drilling*, 278

S.W.3d at 338. We begin by considering whether Innovative Therapies's contacts with Texas constitute purposeful availment.

### 1. Purposefully Availed Itself of the Forum

As noted, *supra*, a purposeful availment analysis considers (i) only the conduct of the nonresident defendant, (ii) whether the defendant's contacts with the forum were purposeful, rather than random, fortuitous, or attenuated, and (iii) whether the defendant sought a benefit, advantage, or profit by availing itself of the jurisdiction. *Moki Mac*, 221 S.W.3d at 575. In applying this analysis, we focus on the nature and the quality of Innovative Therapies's contacts with Texas, not the number of contacts. *Republic Drilling*, 278 S.W.3d at 339.

Based on this record, we conclude that Innovative Therapies has purposefully availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws. Vogel, who was aware of Xu's particular engineering skills from their previous association, initiated contact with Xu, a Texas resident. Vogel, on behalf of Innovative Therapies purposefully set out to apprise Xu of the venture and persuade him to stop working for a competitor, BlueSky. Although Vogel stated he did not know where Xu was located when he made that initial contact, Vogel certainly became aware that Xu was located in Texas after Xu agreed to travel to Maryland and look at the device, a trip paid for by Innovative Therapies. Based on their initial contacts with him, Vogel and Tumey convinced Xu to stop working for a competitor and join the Innovative Therapies "team" to develop the initial prototype into a product.

Thereafter, from September 2006 through May 2007, Vogel, Tumey, and Xu participated in conference calls once to twice a week with Xu reporting on his progress in redesigning the prototype to comply with medical device rules and guidelines. Over this seven-month period, Vogel, Tumey,

and Xu discussed the product features and changes by telephone and in email exchanges to and from Xu in San Antonio. Further, Innovative Therapies incorporated Xu's work on the circuit board and the software code into the final product, ultimately receiving FDA approval. Innovative Therapies paid Xu's expenses and his out-of-pocket expenses for products he purchased in Texas that were necessary for his work on the Svedman device. Moreover, Innovative Therapies ultimately awarded Xu ownership in the company for the work he had done while in Texas. Although it may not market the Svedman device to users in Texas, Innovative Therapies certainly intends to benefit from Xu's work performed in Texas with the sale of the Svedman device outside of Texas. Moreover, Innovative Therapies was well aware of the risk of litigation by KCI in Texas based on the launch of its Svedman device. Tumey testified that he placed phone calls to two former colleagues at KCI on the eve of the launch to assess whether a working relationship between the companies was possible and, alternatively, to assess the risk of litigation by KCI. Based on the three-part analysis for purposeful availment, we conclude that Innovative Therapies's contacts with Texas were purposeful—not random, fortuitous or attenuated, and were directed at seeking a benefit, advantage, or profit by availing itself of the jurisdiction. *Republic Drilling*, 278 S.W.3d at 339.

Innovative Therapies presents several arguments in support of its position that it did not purposefully avail itself of Texas jurisdiction. We will address each argument in turn. First, Innovative Therapies argues specific personal jurisdiction fails because all of the "contacts" cited in the trial court are little more than allegations that Innovative Therapies directed a tort to Texas which is insufficient to support an exercise of jurisdiction under Texas Supreme Court precedent. *See Michiana*, 168 S.W.3d at 790-91. *Michiana* involved a single commercial transaction initiated from Texas by a Texas resident via telephone to a nonresident seller of recreational vehicles. *Id*. at

784. Sometime after the purchase, the buyer brought suit against the nonresident seller claiming DTPA violations, common law fraud, breach of warranty, and breach of contract based on alleged misrepresentations made in the telephone call. *Id.* The *Michiana* court ultimately held that, although allegations that a tort was committed in Texas do satisfy the Texas long-arm statute, such allegations alone are not sufficient to satisfy the purposeful availment requirement of the due process minimum contacts analysis. *Id.* at 788-792. The Court reasoned that focusing on whether the defendant directed a tort toward Texas as a basis for jurisdiction improperly focuses on the merits of the lawsuit rather than the defendant's contacts with the forum state. *Id.* at 790-91.[7] The Court instead emphasized that it is "the defendant's conduct and connection with the forum that are critical." *Id.* "[M]inimum-contacts analysis focuses solely on the actions and reasonable expectations of the defendant." *Id.* at 790. We agree with the reasoning and holding in *Michiana*, but disagree with Innovative Therapies's basic premise that all of the "contacts" cited in the trial court are little more than allegations that Innovative Therapies directed a tort to Texas. Instead, Innovative Therapies engaged in purposeful acts directed at Texas and involving a Texas resident.

Second, Innovative Therapies argues a case with similar facts, and heavily relied on by KCI, *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277 (Tex. App.—Houston [14th Dist.] 2009, no pet.), is incorrect. In *Nogle*, the court found specific jurisdiction, holding that a non-resident defendant company purposefully availed itself of the benefits and privileges of doing business in Texas by employing a Texas engineer to do design work which was performed in Texas. *Id.* at 283-

---

[7] The Supreme Court later noted in *Moki Mac*, "[i]n *Michiana*, we warned against the dangers of the plaintiff's pleadings driving the analysis, stating that such an approach 'shifts a court's focus from the relationship among the **defendant**, the forum, and the litigation to the relationship among the **plaintiff**, the forum . . . and litigation.'" *Moki Mac*, 221 S.W.3d at 583 (emphasis added).

85.  In *Nogle*, the court held that the company's contacts in Texas were purposeful, in part because the company specifically chose that particular engineer for the project because it "liked his work best." *Id.* at 283.  The court went on to note,

> Even though N & B may have made some such choices, such as not locating any employees or offices in Texas and not targeting the Texas market, it specifically chose to use the work of this Texas resident. That work was performed in Texas, N & B used it in completing its AMOC, and N & B made money doing so when it sold the AMOC to T-34 owners.

*Id.*  Similarly, Innovative Therapies purposefully avoided establishing an office in Texas and targeting the Texas market, while specifically recruiting a particular Texas resident to work on its prototype because he was the best person for the job.  Innovative Therapies, like Nogle & Black, obtained approval of its device based on Dr. Xu's work, and certainly intends to profit from sales of the approved Svedman device.  Moreover, Innovative Therapies was aware that by choosing a former KCI engineer to work on its competitive device, it was risking litigation with KCI.  In *Nogle*, the court noted that litigation was foreseeable when the nonresident company chose to use a Texas engineer doing work in Texas to assist with the design of the project.  *See id.*; *see also GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 880 (Tex. App.—Austin 2008, no pet.) (noting nonresident defendants controlled whether transaction occurred in Texas and that "it is not unreasonable or unexpected that they might be hailed into court here in regard to claims arising from that activity").

At oral argument, counsel for Innovative Therapies asserted that *Nogle* "does not square with" existing precedent by the United States Supreme Court, Texas Supreme Court, and this Court because it focused solely on one contact, *i.e.*, the hiring of a Texas engineer, in finding purposeful availment.  *See Burger King*, 471 U.S. at 478-79 (single contract with a resident of the forum state is insufficient to establish jurisdiction without additional contacts); *Moki Mac*, 221 S.W.3d at 577

(single contact cannot support jurisdiction where it creates only an attenuated affiliation with the forum state); *see also Credit Commercial de France, S.A. v. Morales*, 195 S.W.3d 209, 220-21 (Tex. App.—San Antonio 2006, pet. denied) (merely contracting with a resident of the forum state, or engaging in communications during performance of the contract, is insufficient to subject a nonresident to the forum's jurisdiction); *Tabor, Chhabra & Gibbs, P.A. v. Medical Legal Evaluations, Inc.*, 237 S.W.3d 762, 772-73 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (intermediary's hiring of Texas doctor as expert witness for law firm did not subject nonresident law firm to Texas jurisdiction). Innovative Therapies argues that *Nogle* is wrong because it is a "single contact case," and we should instead follow the line of cases exemplified by *Credit Commercial* and *Tabor* in holding that the "single contact" of engaging Xu to work on the prototype does not subject Innovative Therapies to Texas jurisdiction.

We disagree that *Nogle* based its finding of purposeful availment on a single contact between the nonresident company and Texas. To the contrary, in *Nogle*, the court acknowledged that merely contracting with a Texas resident is not alone sufficient to show purposeful contact with Texas. *Nogle*, 290 S.W.3d at 283 (citing *Olympia Capital Associates, L.P. v. Jackson*, 247 S.W.3d 399, 417 (Tex. App.—Dallas 2008, no pet.)). The court stressed "other factors about the nature of the relationship" as more important, such as the fact that the engineer performed the work in Texas, he did not unilaterally initiate the relationship but was specifically chosen by Nogle & Black, and his work was used to complete the product which was sold for a profit. *Id.* The court further noted that it was "not unreasonable to expect that the choice to use a Texas engineer doing work in Texas to assist with the design of a wing spar modification could lead to litigation in Texas for a claim relating to a wing spar failure." *Id.* The court's conclusion that Nogle & Black's use of the Texas

engineer's services amounted to purposeful contact with Texas was based on all of these reasons, not on the single factor of a contract with a Texas resident. *See id.*

Innovative Therapies argues that we should instead apply the reasoning of *Tabor* to the instant case. In *Tabor*, the Houston Court of Appeals, First District, declined to find specific jurisdiction over an out-of-state law firm and its partner that contracted with an intermediary company which referred a doctor who happened to be in Texas as an expert witness. *Tabor*, 237 S.W.3d at 772-78. The court found the nonresident law firm did not purposefully avail itself of the privilege of conducting activities in Texas because it did not enter into a contract with the Texas physician, and, even if the physician was a third-party beneficiary of the contract between the law firm and the intermediary company, the contract was neither executed in nor required to be performed in Texas. *Id.* at 773-74. Further, the court found there was no evidence of recruitment of this particular Texas physician to be the expert–many different doctors could have served as the expert witness; it was merely fortuitous that the doctor who was selected by the intermediary company happened to reside in Texas, and thus the recruitment allegations would not support specific jurisdiction. *Id.* at 777. *Tabor* is distinguishable from the instant case on that very basis–the defendants in *Tabor* did not specifically seek out and recruit the particular Texas physician for employment, as Innovative Therapies did with Dr. Xu. *See id.*

Finally, Innovative Therapies relies on two prior cases in which this Court stated that merely contracting with a Texas resident, and having communications incidental to the contract, does not subject the nonresident to Texas jurisdiction. *See Credit Commercial*, 195 S.W.3d at 220-21 (merely contracting with resident of the forum state, and engaging in communications during performance of contract, is insufficient to subject nonresident to forum's jurisdiction); *see also Magnolia Gas Co.*

*v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 691 (Tex. App.—San Antonio 1998), *abrogated on other grounds, BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789 (Tex. 2002) (same). We acknowledge this well-established rule. The two San Antonio cases are, however, factually distinguishable from the instant case. In *Credit Commercial*, we held that Texas could not assert specific jurisdiction over a French bank, its subsidiary, and a Bahamian bank because they had no facilities, personnel, or assets in Texas, structured their business transactions to avoid Texas jurisdiction, the contracts were performed outside Texas, the communications during the four-year period were remote and related solely to the receipt of funds, and any visits by officers were incidental and more in the nature of a social visit. *Credit Commercial*, 195 S.W.3d at 220-23. In *Magnolia Gas*, we held the defendants did not purposefully avail themselves of the protections of Texas law when they assumed a contract with a Texas corporation because their contacts with Texas, including meetings and sending payments into Texas, were entirely incidental and immaterial to the purpose of the assumed contract and were not initiated by the defendants. *Magnolia Gas*, 994 S.W.2d at 692.

Here, Innovative Therapies initiated the contact with Texas by seeking out and recruiting Xu for his specialized skill, arranged for him to work on improving its Svedman prototype, and engaged in substantive communications with Xu about the changes to the prototype during a seven-month period. The record supports an implied finding that the communications between Xu and Tumey and Vogel at Innovative Therapies were active, collaborative phone calls and emails as part of an on-going "team" effort to complete the substantive work being done on the prototype by both Xu in Texas and Tumey at Innovative Therapies. In addition to working on the prototype himself, Tumey was closely supervising Xu's work on the prototype, with twice weekly phone calls during the seven-

month period Xu worked in Texas. Thus, the quality of the communications between Xu and Tumey and Vogel are distinguishable from the communications in *Credit Commercial* and *Magnolia*, which were not material to the substance of the contract, but rather only incidental, pertaining to such matters as whether payments were received. In addition, other critical factors are present here in that Innovative Therapies actively and specifically sought out and recruited Xu, a Texas resident, for his skill and knowledge, to improve its prototype of the Svedman device and obtained approval based on his work; Xu built the new prototype in Texas, and Innovative Therapies's use of Xu's work in the device is the source of the current litigation between KCI and Innovative Therapies.

In summary, focusing our jurisdictional analysis only on Innovative Therapies's contacts with Texas, we hold Innovative Therapies's contacts with Texas do demonstrate that it purposefully availed itself of the privilege of conducting activities in Texas. Despite the fact that Innovative Therapies attempted to avoid Texas, there is legally and factually sufficient evidence to demonstrate that Innovative Therapies reached out to Texas by initiating contact with Xu and intentionally recruiting Xu away from a competitor to work on its Svedman prototype. Over the next seven months, Innovative Therapies maintained on-going and regular communications with Xu as changes and improvements were made to the prototype by Xu and Tumey. Innovative Therapies knew Xu lived and worked in San Antonio during the seven months it collaborated with him on the device. Innovative Therapies did not want just any engineer to work on its prototype, or even just any former KCI engineer–it especially wanted Dr. Xu. Furthermore, Innovative Therapies both reimbursed Xu for all his expenses and costs related to his work and ultimately compensated him for his work by giving him an ownership interest in the company. Innovative Therapies accepted and incorporated Xu's work into the final Svedman device, seeking and obtaining FDA approval based, at least in

part, on Xu's improvements. Finally, Innovative Therapies intends to profit from the use of Xu's work. Moreover, the record contains sufficient evidence that Innovative Therapies anticipated that litigation was foreseeable when it chose to use Xu to assist with the design of the Svedman prototype. As admitted by Innovative Therapies in briefing before this court, both Vogel and Tumey believed that Innovative Therapies faced the threat of a patent infringement lawsuit by KCI if it launched the Svedman device. On the eve of the launch, Tumey contacted two of his former KCI colleagues in San Antonio to determine if a business relationship was possible between Innovative Therapies and KCI in the field of negative pressure wound therapy, and, alternatively, to assess the risk of litigation by KCI. Such actions and reasonable expectations by Innovative Therapies are sufficient to establish purposeful availment. *Nogle & Black*, 290 S.W.3d at 283.

### 2. Relationship Between Texas Contacts and Operative Facts of Litigation

"[P]urposeful availment alone will not support an exercise of specific jurisdiction . . . unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. KCI argues Innovative Therapies's contacts with Texas are substantially related to the operative facts of the litigation because the essence of KCI's suits is that Innovative Therapies recruited and employed ex-employees of KCI in Texas for the purpose of wrongfully using the knowledge they gained at KCI to help design a competing product. Innovative Therapies counters that none of its alleged purposeful contacts are substantially connected to the operative facts of this litigation because KCI has refused to identify the trade secrets and confidential information at issue or identify where those trade secrets and confidential information are allegedly located in the Svedman device. Specifically, KCI submitted the affidavit of Nadeem Bridi, its in-house counsel, who swore that he examined the Svedman device and its accompanying literature and concluded that the device

incorporated KCI's confidential information. When Bridi was deposed, however, Bridi followed the advice of KCI's counsel and refused to identify the trade secrets or confidential information he claimed was incorporated into the Svedman device. Without the specific identification of the trade secrets and confidential information at issue and where those are located in the Svedman device, Innovative Therapies contends there is absolutely no nexus between its supposed contacts with Texas and the asserted claims. *See Michiana*, 168 S.W.3d at 794 (bare tort allegations are legally insufficient to support the exercise of specific jurisdiction). We disagree.

Whether Innovative Therapies actually used trade secrets and confidential information wrongfully obtained from ex-employees of KCI in completing the Svedman device is a merits-based question that should not be resolved at the special appearance stage. *Moki Mac*, 221 S.W.3d at 582 (declining to adopt rule that "would require a court to delve into the merits to determine whether a jurisdictional fact is actually a legal cause of the injury"); *Nogle & Black*, 290 S.W.3d at 284 (whether engineer actually was negligent regarding the wing spars and whether a problem with wing spars actually caused the crash are merits-based questions that should not be resolved in context of special appearance); *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (whether Lamb *actually* used the Pulmosan hood is merits-based question that should not be resolved in a special appearance). Instead, for purposes of determining whether the defendant's liability arises from or relates to the forum contacts, we take KCI's pleading and allegations as true and focus our analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 582. For jurisdictional purposes, Bridi's affidavit creates a fact issue regarding whether Xu used trade secrets and confidential

information and that is sufficient to support the trial court's determination that it has jurisdiction over Innovative Therapies.

### 3. *Traditional Notions of Fair Play and Substantial Justice*

Finally, having determined that Innovative Therapies had minimum contacts with Texas sufficient to support specific jurisdiction, we must determine whether subjecting it to the jurisdiction of Texas would offend traditional notions of fair play and substantial justice. *Republic Drilling*, 278 S.W.3d at 341. In making this determination, we consider (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining relief, (4) the interstate justice system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987) (citing *World-Wide Volkswagen Corp, v. Woodson*, 444 U.S. 286, 292 (1980)). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minium contacts with the forum state." *Spir Star AG v. Kimich*, No. 07-0340, 2010 WL 850151, at *8 (Tex. Mar. 12, 2010) (quoting *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991), and citing *Burger King*, 471 U.S. at 477). Innovative Therapies must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable" in order to defeat jurisdiction. *Id.* (quoting *Burger King*, 471 U.S. at 477). It has failed to do so.

Innovative Therapies concedes that Texas has an interest in the litigation because KCI's principal place of business is in Texas, but argues it is unfair to subject it to the jurisdiction of Texas when it steadfastly structured its operations to avoid Texas, neither seeking any benefit from

connections with Texas nor deriving any profit from Texas. *See Michiana*, 168 S.W.3d at 785 ("a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction"). Innovative Therapies maintains it would be significantly burdened by litigating in Texas due to travel, and argues Maryland is the better forum—KCI can obtain relief in Maryland against all defendants since three of the named individuals reside in Maryland and Xu has significant contacts with the state because he is a shareholder of Innovative Therapies; many witnesses are located there; and should KCI prevail and obtain a money judgment against Innovative Therapies, its property is located there. We disagree that litigation of this case in Texas would pose a substantial burden on Innovative Therapies.

As acknowledged by Innovative Therapies, Texas has an interest in the litigation because KCI's principal place of business is in Texas. Innovative Therapies's co-defendants, who are the officers and shareholders of the corporation, have already submitted to the jurisdiction of the Texas court. Litigating the cases in both Texas and Maryland would therefore duplicate costs and be inconvenient for the parties as well as the witnesses; further, it would be a waste of judicial resources. Considering all factors, the trial court's exercise of personal jurisdiction over Innovative Therapies does not offend justice or fairness.

## CONCLUSION

Because Innovative Therapies engaged in minimum contacts with Texas sufficient to subject it to specific jurisdiction in a Texas court, and because the exercise of such jurisdiction would not offend traditional notions of fair play and substantial justice, we affirm the trial court's orders denying the special appearances by Innovative Therapies. Our resolution of this appeal based on the

existence of specific jurisdiction forecloses the need to address the arguments related to general jurisdiction.


Phylis J. Speedlin, Justice